# SUMNER, DIRECTOR, NEVADA DEPARTMENT OF PRISONS, ET AL. *v.* SHUMAN

No. 86–246.   Argued April 20, 1987—Decided June 22, 1987

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, STEVENS, and O'CONNOR, JJ., joined.   WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 86.

*Brian McKay,* Attorney General of Nevada, argued the cause for petitioners.   With him on the briefs was *Brooke A. Nielsen,* Deputy Attorney General.

*Daniel Markoff,* by appointment of the Court, 481 U. S. 1004, argued the cause for respondent.   With him on the brief was *N. Patrick Flanagan III.*[*]

---

[*]Briefs of *amici curiae* urging affirmance were filed for the Center for Constitutional Rights et al. by *William M. Kunstler;* and for Johnny Harris et al. by *Ruth A. Bourquin, Gary S. Guzy, Steven A. Reiss,* and *Stanley A. Teitler.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether a statute that mandates the death penalty for a prison inmate who is convicted of murder while serving a life sentence without possibility of parole comports with the Eighth and Fourteenth Amendments.

I

In 1958, respondent Raymond Wallace Shuman was convicted in a Nevada state court of first-degree murder for the shooting death of a truckdriver during a roadside robbery. He was sentenced to life imprisonment without possibility of parole under § 200.030 of Nev. Rev. Stat., which at that time provided the jury with sentencing options of the death penalty or of life imprisonment with or without the possibility of parole. See 1957 Nev. Stats., ch. 238. In 1975, while serving his life sentence, Shuman was convicted of capital murder for the killing of a fellow inmate. Pursuant to the revised version of § 200.030 then in effect, Shuman's conviction mandated that he be sentenced to death.[1] The Nevada Supreme

---

[1] After 1958, § 200.030 was amended several times. The statute in force at the time Shuman was convicted for the inmate murder and sentenced to death was enacted in 1973 and read in pertinent part as follows:

"1. Capital murder is murder which is perpetrated by:

.     .     .     .     .

"(b) A person who is under sentence of life imprisonment without possibility of parole.

.     .     .     .     .

"5. Every person convicted of capital murder shall be punished by death." 1973 Nev. Stats., ch. 798, § 5, pp. 1803–1804.

This statute remained in effect, with only slight modification, see 1975 Nev. Stats., ch. 740, p. 1580, until 1977. In that year, the Nevada Legislature provided for a separate penalty hearing. Under that version, still current, the sentencing authority must find that at least one statutory aggravating circumstance exists in order to impose the death penalty. See Nev. Rev. Stat. § 200.030.4(a) (1985). One of the listed aggravating circumstances is when the murder is "committed by a person under sentence of imprisonment." § 200.033.1. The sentencing authority, however, may

Court affirmed Shuman's conviction and the imposition of the death penalty. It specifically rejected respondent's claims of error, including his objection that the mandatory imposition of the death sentence violated his rights under the Eighth and Fourteenth Amendments. *Shuman* v. *State*, 94 Nev. 265, 578 P. 2d 1183 (1978).

Shuman unsuccessfully pursued his challenge to the mandatory capital-punishment statute in a state habeas petition. After exhausting state remedies, Shuman filed a petition in Federal District Court seeking habeas corpus relief under 28 U. S. C. § 2254. The District Court rejected all his claims except his challenge to the constitutionality of the mandatorily imposed death sentence. *Shuman* v. *Wolff*, 571 F. Supp. 213 (Nev. 1983).

The District Court acknowledged that in several cases this Court had reserved judgment on the question whether a mandatory death penalty may be justified in the case of an inmate serving a life sentence who is convicted of murder. *Id.*, at 216. The District Court reasoned, however, that under the rule set forth in *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), that capital-sentencing authorities be permitted to consider any relevant mitigating circumstance in their decision, Shuman's death sentence was invalid. 571 F. Supp., at 216–218. It found that the availability of a nonmandatory death penalty was a sufficient deterrent to life-term inmates and that making a death sentence mandatory "only serves to give the imposition of the death sentence the air of arbitrariness and caprice." *Id.*, at 217. It held that § 200.030.1(b) in effect at the time Shuman was sentenced to death therefore violated the Eighth and Fourteenth Amendments, and it ordered that Shuman's death sentence be vacated. The Dis-

---

consider any relevant mitigating circumstance. See § 200.035, set forth in n. 10, *infra*.

Respondent's inmate murder thus took place during the 4-year period from 1973 to 1977 when the mandatory death penalty was imposed by Nevada law.

trict Court noted, however, that the State was not foreclosed from initiating and completing "lawful resentencing proceedings." 571 F. Supp., at 218.

The United States Court of Appeals for the Ninth Circuit affirmed the District Court's judgment. *Shuman* v. *Wolff*, 791 F. 2d 788 (1986). That court also noted that we had left open the question of the constitutionality of the type of mandatory statute at issue in this case, see *id.*, at 792, but it discounted what it perceived to be the two possible rationales justifying a statute of that kind. It first rejected the argument that the mandatory statute provided adequate individualized consideration. It reasoned that the fact that Shuman was serving a life sentence without possibility of parole did not render it unnecessary for a sentencing authority to be permitted to consider relevant mitigating circumstances in deciding whether to sentence him to death. The court identified possibly relevant circumstances, such as the conduct that led to the imposition of the life sentence and the "age and the mental or emotional state of the defendant, the provocation for the killing, the pressure from other inmates, and the record of the defendant in prison since the first offense." *Id.*, at 795.

The Court of Appeals also rejected the argument that the mandatory statute was necessary as a deterrent for life-term inmates. *Ibid.* It found that any deterrent effect of capital punishment exists under statutes that provide individualized capital-sentencing determinations. In closing, it voiced its agreement with the Court of Appeals of New York that a "'mandatory death statute simply cannot be reconciled with the scrupulous care the legal system demands to insure that the death penalty fits the individual and the crime.'" *Id.*, at 796, quoting *People* v. *Smith*, 63 N. Y. 2d 41, 78, 468 N. E. 2d 879, 897 (1984), cert. denied, 469 U. S. 1227 (1985).

We granted certiorari, 479 U. S. 948 (1986), to resolve this question of the constitutionality of a death sentence imposed,

pursuant to a mandatory capital-sentencing statutory procedure, on an inmate serving a life sentence.

## II

### A

The Nevada statute under which Shuman was sentenced to death was in force for four years. It was enacted shortly after this Court's decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, and was repealed soon after the decisions in *Gregg* v. *Georgia*, 428 U. S. 153 (1976), and *Woodson* v. *North Carolina*, 428 U. S. 280 (1976). Prior to *Furman*, the Nevada capital-sentencing statute simply provided that, after a person was convicted of first-degree murder, the jury was to fix the penalty at death or life imprisonment, *with or without* possibility of parole, except that in cases of persons already serving a sentence of life imprisonment the penalty was to be death or life imprisonment *without* possibility of parole. See 1967 Nev. Stats., ch. 523, § 438, p. 1470. The statute provided no guidance to the jury about how to make the sentencing decision or what, if any, individual factors it was to consider.

In *Furman*, this Court, in effect, invalidated all such capital-punishment statutes because of its conclusion that statutes permitting juries absolute discretion in making the capital-sentencing determination resulted in the death penalty's being arbitrarily and capriciously imposed, in violation of the Eighth and Fourteenth Amendments. On May 3, 1973, less than a year after *Furman*, the Nevada Legislature replaced its unguided-discretion statute with one that created a category of "capital murder." The new statute provided a list of situations, which, if found to exist in conjunction with the murder, would render the killing a "capital murder." The statute mandated that the death penalty was to be imposed on all persons convicted of those offenses. See n. 1,

*supra.* The legislature specifically explained in the statute's preamble that the mandatory statute was intended to prevent the arbitrary and capricious imposition of the death penalty. See 1973 Nev. Stats., ch. 798, p. 1801. This was the statute under which respondent was sentenced to death.

Nevada's adoption of a mandatory-sentencing scheme represented one of the two responses of various States to the *Furman* decision. Although every State had abandoned mandatory capital-sentencing procedures prior to *Furman* because they had proved unsatisfactory, see *Woodson* v. *North Carolina*, 428 U. S., at 291–292 (plurality opinion), some States, including Nevada, enacted mandatory statutes after *Furman.* Those States read the several opinions supporting the judgment in *Furman* as a signal that mandatory-sentencing procedures would avoid the arbitrary and capricious pitfalls of unguided discretionary procedures. See *Woodson* v. *North Carolina*, 428 U. S., at 298–299 (plurality opinion); *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S. 325, 328–329, 331 (1976) (plurality opinion). See also *Furman* v. *Georgia*, 408 U. S., at 413 (dissenting opinion, where this alternative was forecast). Other States, however, maintained individualized sentencing, but narrowed the category of offenses to which the penalty could be applied, bifurcated the trial to provide a separate sentencing proceeding, and provided guidance to the sentencing authority about how to determine the appropriateness of the death penalty in a particular case. See, *e. g., Gregg* v. *Georgia*, 428 U. S., at 162–168 (opinion of Stewart, POWELL, and STEVENS, JJ.). The Court on prior occasions has recognized these differing responses to *Furman* and the uncertain state of capital-punishment law following that decision. See *Woodson* v. *North Carolina*, 428 U. S., at 298–299 (plurality opinion); *Lockett* v. *Ohio*, 438 U. S. 586, 599–600 (1978).

The Court's opinions in 1976 addressing the constitutionality of five post-*Furman* state statutes did much to clarify

what standards must be met to render a capital-punishment statute facially constitutional. In explaining why the guided-discretion statutes of Georgia, Florida, and Texas were facially valid, but the mandatory statutes of North Carolina and Louisiana were not, the Court relied to a significant degree on the unique nature of the death penalty and the heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case. See *Gregg* v. *Georgia,* 428 U. S., at 189–195 (opinion of Stewart, POWELL, and STEVENS, JJ.); *Proffitt* v. *Florida,* 428 U. S. 242, 252–253 (1976) (same); *Jurek* v. *Texas,* 428 U. S. 262, 271–272 (1976) (same); *Woodson* v. *North Carolina,* 428 U. S., at 303–305 (plurality opinion); *Roberts (Stanislaus)* v. *Louisiana,* 428 U. S., at 333–335 (plurality opinion). The principal opinions in these cases established that in capital cases, "it is *constitutionally* required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence." *Gregg* v. *Georgia,* 428 U. S., at 189–190, n. 38 (emphasis added); see also, *e. g., Woodson* v. *North Carolina,* 428 U. S., at 304.

In the year following these decisions, the Nevada Legislature replaced its mandatory statute with a guided-discretion statute similar to the Georgia legislation upheld in *Gregg.* See 1977 Nev. Stats., ch. 430, § 82, p. 864; ch. 585, §§ 1–10, pp. 1541–1545. Nevada's repeal of its mandatory capital-sentencing statute was consistent with the nationwide trend after *Gregg* and *Woodson* that has resulted in legislative repeal or judicial invalidation of all such statutes.[2]

---

[2] Nine of the eleven States that had a mandatory death-penalty statute applicable to life-term inmates in the 1970's, including Nevada, have repealed or amended the statutes by legislative enactment. See Ala. Code § 13–1–75 (1975), repealed by 1977 Ala. Acts, Act No. 607, § 9901, and current provision at Ala. Code §§ 13A–5–39 to 13A–5–59 (1982 and Supp. 1986); 1973 Cal. Stats., ch. 719, § 13, amended by 1977 Cal. Stats., ch. 316, §§ 21–26, pp. 1264–1266, and current provision at Cal. Penal Code Ann. § 4500 (West Supp. 1987); Ind. Code Ann. § 10–3401(b)(6)(iv) (Burns Supp.

## B

It is important to examine once again the establishment of the individualized capital-sentencing doctrine in this Court's opinions issued in 1976 and the development of that doctrine in the ensuing decade, before determining whether an exception is justified in the present case. In each of the five death-penalty cases decided in 1976, the Court's judgment rested on a joint opinion of Justices Stewart, POWELL and

---

1975), amended and current provision at Ind. Code §§ 35–50–2–3 and 35–50–2–9 (1982 and Supp. 1986); La. Rev. Stat. Ann. § 14:30(3) (West 1951, Supp. 1974), amended by 1976 La. Acts, No. 657, § 1, and current provision at La. Rev. Stat. Ann. § 14:30 (West 1986); 1974 Miss. Gen. Laws, ch. 576, § 7, p. 867, amended and current provision at Miss. Code Ann. §§ 97–3–19, 97–3–21, 99–19–101, 99–19–103, 99–19–105, and 99–19–107 (Supp. 1986); 1973 Nev. Stats., ch. 798, § 5, pp. 1803–1804, amended and current provision at Nev. Rev. Stat. § 200.030 (1985); 1973 Okla. Sess. Laws, ch. 167, §§ 1, 3, pp. 240–241, repealed by 1976 Okla. Sess. Laws, 1st Extr. Sess., ch. 1, § 10, p. 630, and current provision at Okla. Stat., Tit. 21, §§ 701.7, 701.9 to 701.15 (1981 and Supp. 1986); Va. Code §§ 18.2–10(a) and 18.2–31(c) (1975), amended and current provision at Va. Code §§ 18.2–10(a) (1982), §§ 19.2–264.2 and 19.2–264.3 (1983); Wyo. Stat. § 6–54(b)(v) (Supp. 1975), and current provision at Wyo. Stat. §§ 6–2–101 to 6–2–103 (1983).

The mandatory capital-sentencing statutes for life-term inmates in the other States were struck down as unconstitutional by state courts. See *People* v. *Smith*, 63 N. Y. 2d 41, 468 N. E. 2d 879 (1984), cert. denied, 469 U. S. 1227 (1985); *State* v. *Cline*, 121 R. I. 299, 397 A. 2d 1309 (1979); see also *Graham* v. *Superior Court of City and County of San Francisco*, 98 Cal. App. 3d 880, 160 Cal. Rptr. 10 (1979) (invalidating death sentence imposed under mandatory statute that had been subsequently repealed by legislature); see generally Acker, Mandatory Capital Punishment for the Life Term Inmate Who Commits Murder: Judgments of Fact and Value in Law and Social Science, 11 New England J. Crim. & Civ. Confinement 267, 272, n. 16, 287–289, n. 45 (1985) (Acker).

As is evident from the litigation before us, however, Shuman's death sentence was not affected by the new Nevada statute. The death sentences imposed on two life-term inmates under the Alabama mandatory capital-sentencing statute also were not affected when that State's legislature repealed its statute. These two persons appear to be the only other individuals currently under a sentence of death that was imposed under a mandatory procedure. See Brief for Johnny Harris and Donald Thigpen as *Amici Curiae* 2.

STEVENS. Those five opinions, reflecting the views of the only Members of the Court to vote in support of all five judgments, drew a critical line between post-*Furman* statutes that could survive constitutional scrutiny and those that could not. In the three cases upholding the guided-discretion statutes, the opinions emphasized the fact that those capital schemes permitted the sentencing authority to consider relevant mitigating circumstances pertaining to the offense and a range of factors about the defendant as an individual. See *Gregg* v. *Georgia*, 428 U. S., at 197, 206; *Proffitt* v. *Florida*, 428 U. S., at 251–252; *Jurek* v. *Texas*, 428 U. S., at 270–271. In the two cases striking down as unconstitutional mandatory capital-sentencing statutes, the opinions stressed that one of the fatal flaws in those sentencing procedures was their failure to permit presentation of mitigating circumstances for the consideration of the sentencing authority. See *Woodson* v. *North Carolina*, 428 U. S., at 303–305; *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S., at 333–334.

The *Woodson* opinion explained: "While a mandatory death penalty statute may reasonably be expected to increase the number of persons sentenced to death, it does not fulfill *Furman*'s basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." 428 U. S., at 303. The shortcomings of a mandatory capital-sentencing procedure were set forth:

"A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of

a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Id.*, at 304.

The opinion went on to specify that unlike individualized-sentencing procedures in noncapital cases that were simply a matter of policy, such procedures in capital cases were of constitutional significance:

"While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Ibid.*[3]

The constitutional mandate of individualized determinations in capital-sentencing proceedings continued to guide this Court's review of capital-punishment statutes in the ensuing decade. It led the Court to invalidate another aspect of Louisiana's mandatory statute the following year. See *Roberts (Harry)* v. *Louisiana*, 431 U. S. 633, 637 (1977) *(per curiam)*. It also has had a significant impact on our decisions in cases where the sentencing authority's consideration of mitigating circumstances had been restrained in some manner. Beginning with *Lockett* v. *Ohio*, 438 U. S. 586 (1978), a plurality of the Court recognized that in order to

---

[3] In rejecting the mandatory capital-sentencing provision before the Court in *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S. 325 (1976), the plurality acknowledged that the provision was drawn more narrowly than the North Carolina statute at issue in *Woodson*, but it emphasized: "The futility of attempting to solve the problems of mandatory death penalty statutes by narrowing the scope of the capital offense stems from our society's rejection of the belief that 'every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender.'" 428 U. S., at 333, quoting *Williams* v. *New York*, 337 U. S. 241, 247 (1949).

give meaning to the individualized-sentencing requirement in capital cases, the sentencing authority must be permitted to consider *"as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense." *Id.*, at 604 (emphasis in original). In *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), a majority of the Court accepted the *Lockett* plurality's approach. Not only did the Eighth Amendment require that capital-sentencing schemes permit the defendant to present any relevant mitigating evidence, but *"Lockett* requires the sentencer to listen" to that evidence. 455 U. S., at 115, n. 10.[4] Finally, earlier this Term, in *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987), the Court, by a unanimous vote, invalidated a death sentence because "the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances." *Id.*, at 398–399. We unequivocally relied on the rulings in *Lockett* v. *Ohio*, and *Eddings* v. *Oklahoma*, that the Eighth and Fourteenth Amendments require that the sentencing authority be permitted to consider any relevant mitigating evidence before imposing a death sentence. 481 U. S., at 394 and 398–399.[5]

---

[4] JUSTICE O'CONNOR, in concurring, concluded that "the reasoning of the plurality opinion in *Lockett* compels a remand so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" *Eddings* v. *Oklahoma*, 455 U. S., at 119, quoting *Lockett*, 438 U. S., at 605.

[5] We also relied on *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), where we reinforced the constitutional significance of the capital-sentencing authority's consideration of evidence that "would be 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.'" *Id.*, at 4–5, quoting *Lockett* v. *Ohio*, 438 U. S., at 604.

In still another decision earlier this Term, several Members of the Court again acknowledged the constitutional significance of this principle. See *California* v. *Brown*, 479 U. S. 538, 541 (1987) (noting that one of the central principles established by this Court's Eighth Amendment jurisprudence is that consideration of a defendant's character or record, and the circumstances of the offense are a "'constitutionally indispensable part of the process of inflicting the penalty of death,'" quoting *Woodson* v. *North*

## III

Although the above explication of the development and current status of this constitutional doctrine itself would appear to resolve the question presented by this case, the Nevada statute at issue here applies to the particular situation of a life-term inmate who has been convicted of murder, and we have reserved judgment on the constitutionality of such a statute. We have declined to determine whether a mandatory statute applied to life-term inmates could withstand constitutional scrutiny, noting that perhaps the "extrem[e] narrow[ness]" of such a statute, see *Woodson* v. *North Carolina*, 428 U. S., at 287, n. 7 (plurality opinion), or a particular deterrence concern, see *Gregg* v. *Georgia*, 428 U. S., at 186 (joint opinion); *Lockett* v. *Ohio*, 438 U. S., at 604, n. 11 (plurality opinion), could render individualized sentencing unnecessary. See also *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S., at 334, n. 9 (plurality opinion); *Roberts (Harry)* v. *Louisiana*, 431 U. S., at 637, n. 5.[6] After consideration

---

*Carolina,* 428 U. S. 280, 304 (1976)); 479 U. S., at 545 (concurring opinion) ("*Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime") (emphasis in original).

[6] Acceptance of petitioners' assertion that the language used in the opinions reserving judgment on this matter "imports more than merely leaving the question open," Brief for Petitioners 21, of course would defeat the entire purpose of deferring resolution of the issue. Petitioners' attempt to evade the expressed intent to leave the question open until it was presented directly is especially inappropriate when the very cases on which we focus today provide several examples of this prudent approach to development of constitutional doctrine. Compare *Gregg* v. *Georgia*, 428 U. S. 153, 187, n. 35 (1976) (reserving judgment on question whether death penalty could constitutionally be imposed as sanction for crime such as rape that did not result in death of victim), with *Coker* v. *Georgia*, 433 U. S. 584 (1977) (declaring death penalty to be constitutionally disproportionate sanction for rape of an adult); compare *Woodson* v. *North Carolina*, 428 U. S., at 305, n. 40 (plurality opinion) (reserving judgment on question

of this case, which places the issue squarely before us, we conclude that a departure from the individualized capital-sentencing doctrine is not justified and cannot be reconciled with the demands of the Eighth and Fourteenth Amendments.

### A

The Nevada mandatory capital-sentencing statute under which Shuman was sentenced to death precluded a determination whether any relevant mitigating circumstances justified imposing on him a sentence less than death. Redefining the offense as capital murder and specifying that it is a murder committed by a life-term inmate revealed only two facts about respondent—(1) that he had been convicted of murder while in prison, and (2) that he had been convicted of an earlier criminal offense which, at the time committed, yielded a sentence of life imprisonment without possibility of parole. These two elements had to be established at Shuman's trial to support a verdict of guilty of capital murder. After the jury rendered that verdict of guilty, all that remained for the trial judge to do was to enter a judgment of conviction and impose the death sentence. The death sentence was a foregone conclusion.

These two elements of capital murder do not provide an adequate basis on which to determine whether the death sentence is the appropriate sanction in any particular case. The fact that a life-term inmate is convicted of murder does not reflect whether any circumstance existed at the time of the murder that may have lessened his responsibility for his acts even though it could not stand as a legal defense to the mur-

---

whether death penalty could constitutionally be imposed on individual who was not at actual scene of robbery that resulted in the two fatal shootings for which he was convicted), with *Enmund* v. *Florida*, 458 U. S. 782 (1982) (death penalty is constitutionally disproportionate punishment unless defendant killed, attempted to kill, intended to kill, or intended that lethal force be used), and *Tison* v. *Arizona*, 481 U. S. 137 (1987) (death penalty constitutionally proportionate in case where defendant is major participant in felony committed, combined with reckless indifference to human life).

der charge.   This Court has recognized time and again that the level of criminal responsibility of a person convicted of murder may vary according to the extent of that individual's participation in the crime.   See, *e. g.*, *Tison* v. *Arizona*, 481 U. S. 137 (1987); *Enmund* v. *Florida*, 458 U. S. 782 (1982). Just as the level of an offender's involvement in a routine crime varies, so too can the level of involvement of an inmate in a violent prison incident.[7]   An inmate's participation may

---

[7] The variety of circumstances that may surround a murder by a life-term inmate is illustrated by examining the facts of Shuman's case and the facts in the cases of the other two life-term inmates currently under a mandatorily imposed sentence of death.   Shuman was convicted of capital murder for the killing of a fellow inmate by burning him with a flammable liquid.   *Shuman* v. *State*, 94 Nev. 265, 267, 578 P. 2d 1183, 1184 (1978). The incident apparently resulted from a fight about opening a window near their cells.   *Ibid.*

In *Harris* v. *State*, 352 So. 2d 460 (Ala. Crim. App. 1976), aff'd, 352 So. 2d 479 (Ala. 1977), denial of petition for writ of error *coram nobis* aff'd, 367 So. 2d 524 (Ala. Crim. App. 1978), review denied, *Ex parte Harris*, 367 So. 2d 534 (Ala. 1979), the life-term inmate was convicted of first-degree murder for the killing of a guard that occurred during a prison uprising. He denied participating in the stabbing of the guard and claimed that he was coerced into participating in the uprising because he feared for his life. In his opinion dissenting from the affirmance of the inmate's death sentence, Chief Justice Torbert explained: "The constitutional inadequacy of [the mandatory-sentencing procedure] is accentuated by the facts in this case.   The defendant . . . , though found guilty of first degree murder, presented evidence that his participation in the prison riot was coerced by his fellow inmates.   Though this does not constitute a defense for his crime, it is obviously a factor which could mitigate against the death penalty, and therefore should be considered in the sentencing procedure." 352 So. 2d, at 488.

*Thigpen* v. *State*, 355 So. 2d 392 (Ala. Crim. App.), aff'd, 355 So. 2d 400 (Ala. 1977), denial of petition for writ of *coram nobis* aff'd, 372 So. 2d 385 (Ala. Crim. App.), review denied, *Ex parte Thigpen*, 372 So. 2d 387 (Ala. 1979), cert. denied, 444 U. S. 1026 (1980), presents the situation where a life-term inmate is convicted of a murder outside the prison environment. Thigpen was convicted of first-degree murder for the killing of a farmer, committed during an escape attempt in which he participated, by a fellow inmate using a fencepost.   355 So. 2d, at 395.   See also Acker, at 310

be sufficient to support a murder conviction, but in some cases it may not be sufficient to render death an appropriate sentence, even though it is a life-term inmate or an inmate serving a particular number of years who is involved.[8]

The simple fact that a particular inmate is serving a sentence of life imprisonment without possibility of parole does not contribute significantly to the profile of that person for purposes of determining whether he should be sentenced to death. It does not specify for what offense the inmate received a life sentence nor does it permit consideration of the circumstances surrounding that offense or the degree of the inmate's participation. At the time respondent Shuman was

---

("Prison murders range from contract-like killings, to victim-precipitated homicides, such as in defense of or in retaliation to homosexual assault, to the slaying of correctional officers during prison riots") and n. 84.

The Nevada Board of Prison Commissioners recognizes that murders in prison involve a range of behavior and may reflect a range of individual responsibility. In the Nevada Department of Prisons' Code of Penal Discipline, the offense of murder of an inmate yields a typical disciplinary segregation term of three years if it is placed in the "low section," four years if it is placed in the "medium section," and five years if it is placed in the "high section." See App. to Postargument Letter of May 14, 1987, from Respondent, Exh. I, pp. 26–27. The Code explains: "The decision on which section to use is based on factors of mitigation and aggravation." *Id.*, at 25. The factors that merit three years of disciplinary segregation instead of five years also may justify a sentence less than death in a case of a particular life-term inmate.

[8] Mandating that sentences imposed on inmates serving life terms be different from sentences imposed on other inmates could produce the odd result of a riot's more culpable participant's being accorded a less harsh sentence than the less culpable participant simply because the less culpable one is serving a life sentence and the more culpable one is serving a sentence of years. For example, in an opinion dissenting from the affirmance of Harris' death sentence, Justice Jones thought the fact should not be overlooked that "[w]hatever the extent of Harris's participation in the killing . . . , the avowed ring leader of this affray was another prisoner . . . . He was implicated from beginning to end by each of the witnesses who testified. His trial for this murder resulted in a sentence of 31 years in prison." *Harris* v. *State*, 352 So. 2d, at 497.

sentenced to death, Nevada law authorized imposition of a life sentence without possibility of parole as a sanction for offenders convicted of a number of offenses other than murder. See, *e. g.*, 1973 Nev. Stats., ch. 798, §§ 6–8, pp. 1804–1805 (authorizing sentence of life without possibility of parole for kidnaping, rape, and battery with substantial bodily harm). Past convictions of other criminal offenses can be considered as a valid aggravating factor in determining whether a defendant deserves to be sentenced to death for a later murder, but the inferences to be drawn concerning an inmate's character and moral culpability may vary depending on the nature of the past offense. The circumstances surrounding any past offense may vary widely as well. Without consideration of the nature of the predicate life-term offense and the circumstances surrounding the commission of that offense, the label "life-term inmate" reveals little about the inmate's record or character. Even if the offense was first-degree murder, whether the defendant was the primary force in that incident, or a nontriggerman like Shuman, may be relevant to both his criminal record and his character.[9] Yet under the mandatory statute, all predicate life-term offenses are given the same weight — a weight that is deemed to outweigh any possible combination of mitigating circumstances.

Not only do the two elements that are incorporated in the mandatory statute serve as incomplete indicators of the circumstances surrounding the murder and of the defendant's

---

[9] Shuman's confession to the 1958 offense and the confession of his codefendant, Melvin Rowland, revealed that Rowland shot the truckdriver while Shuman remained in a car. *Shuman* v. *Wolff*, 791 F. 2d 788, 789 (CA9 1986). In *Harris* v. *State*, 367 So. 2d, at 526, the defendant's sentence of life imprisonment resulted from his guilty pleas to four charges of robbery and one charge of rape. Apparently, each of those offenses was classified as a capital offense at the time committed and could have resulted in a death sentence. *Id.*, at 532. See also S. Minor-Harper & L. Greenfeld, Bureau of Justice Statistics, Special Report, Prison Admissions and Releases, 1982, p. 10, Table 15 (1985) (reflecting that over 35% of life terms imposed in this country in 1982 were for offenses other than murder).

criminal record, but also they say nothing of the "[c]ircumstances such as the youth of the offender, . . . the influence of drugs, alcohol, or extreme emotional disturbance, and even the existence of circumstances which the offender reasonably believed provided a moral justification for his conduct." *Roberts (Harry)* v. *Louisiana*, 431 U. S., at 637. In Shuman's case, a sentencing authority may likely find relevant his behavior during his 15 years of incarceration, including whether the inmate murder was an isolated incident of violent behavior or merely the most recent in a long line of such incidents. There is no reason to believe that several of the mitigating circumstances listed in Nevada's current guided-discretion statute[10] could not be equally applicable to a murder committed by a life-term inmate. Hence, the mandatory capital-sentencing procedure pursuant to which Shuman's death sentence was imposed "create[d] the risk that the death penalty w[ould] be imposed in spite of factors which may call for a less severe penalty." *Lockett* v. *Ohio*, 438 U. S., at 605.

## B

A mandatory capital-sentencing procedure for life-term inmates is not necessary as a deterrent. An inmate who is

---

[10] The current statute reads:

"Murder of the first degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:

"1. The defendant has no significant history of prior criminal activity.

"2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"3. The victim was a participant in the defendant's criminal conduct or consented to the act.

"4. The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.

"5. The defendant acted under duress or under the domination of another person.

"6. The youth of the defendant at the time of the crime.

"7. Any other mitigating circumstance." Nev. Rev. Stat. § 200.035 (1985).

serving a life sentence is not immune from Nevada's death penalty if he is convicted of murder. The fact that a State provides a guided-discretion sentencing procedure does not undermine any deterrent effect that the threat of the death penalty may have. Those who deserve to die according to the judgment of the sentencing authority will be condemned to death under such a statute.

The force of the deterrent argument for this mandatory statute is weakened significantly by the fact that every prison system in the country is currently operating without the threat of a mandatory death penalty for life-term inmates. See n. 2, *supra*. The fact that the Nevada Legislature saw fit to repeal the specific statute at issue here a decade ago seriously undermines petitioners' contention that such a statute is required as a deterrent. Close consideration of the deterrence argument also points up the fact that there is no basis for distinguishing, for purposes of deterrence, between an inmate serving a life sentence without possibility of parole and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy.

We also reject the proposition that a mandatory death penalty for life-term inmates convicted of murder is justified because of the State's retribution interests. The argument is that the death penalty must be mandatory for life-term inmates because there is no other available punishment for one already serving a sentence of life imprisonment without possibility of parole.[11] Again, it must be emphasized that under

---

[11] For the sake of argument, we premise our analysis here on a life sentence without possibility of parole which Nevada purportedly imposed on respondent Shuman. In cases such as Harris' and Thigpen's where the inmate is sentenced to life with possibility of parole, the most obvious sanction is to withdraw the parole possibility.

We discovered during oral argument of this case, however, that this in fact could be a meaningful sanction in Shuman's case as well because the first sentence of "life without possibility of parole" may not ultimately mean in Nevada what it seems to say. See Tr. of Oral Arg. 30–38. In

a guided-discretion statute, a life-term inmate does not evade the imposition of the death sentence if the sentencing authority reaches the conclusion, after individualized consideration, that the inmate merits execution by the State.[12] Moreover, there are other sanctions less severe than execution that can be imposed even on a life-term inmate. An inmate's terms of confinement can be limited further, such as through a transfer to a more restrictive custody or correctional facility or deprivation of privileges of work or socialization. In any event, even the retribution interests of the State cannot be characterized according to a category of offense because "[s]ociety's legitimate desire for retribution is less strong with respect to a defendant who played a minor role in the murder for which he was convicted." *Skipper* v. *South Car-*

---

response to a request from the Court during oral argument, respondent has submitted public records that reveal that Melvin Rowland, who was convicted of the same first-degree murder in 1958 and also sentenced to life without possibility of parole, is currently *on parole*. On May 19, 1975, the Nevada Board of Pardons commuted Rowland's sentence to life with possibility of parole. See App. to Postargument Letter of May 14, 1987, from Respondent, Exh. A. On August 26, 1977, the Nevada Board of Parole Commissioners granted Rowland parole. Exh. B. Moreover, since 1975, 17 persons who had been sentenced in Nevada to life without possibility of parole in fact have been paroled. Exh. F. Five others have had their sentences commuted to life with possibility of parole so that release remains a realistic hope for them. *Ibid.* We do not mean to suggest that such a program is not appropriate; it does indicate, however, that in some cases a prison's rehabilitative efforts appear to yield positive results. Nevertheless, it is somewhat misleading, or at least confusing, to argue that the death penalty is the only real sanction that could be imposed on Shuman to punish him for his action while incarcerated. See also Acker, at 321–324, and 289, n. 46 (most life-term inmates in this country have realistic expectation of parole).

[12] The experience in at least one State suggests that mitigation does exist in some cases of life-term inmates convicted of murder. See Brief for Johnny Harris and Donald Thigpen as *Amici Curiae* 17–18, n. 26 (data indicating that during periods when state statute accorded juries discretion in capital sentencing, life sentences were imposed by Alabama juries where life-term inmates were convicted of murder).

*olina,* 476 U. S. 1, 13 (1986) (opinion concurring in judgment). Although a sentencing authority may decide that a sanction less than death is not appropriate in a particular case, the fundamental respect for humanity underlying the Eighth Amendment requires that the defendant be able to present any relevant mitigating evidence that could justify a lesser sentence.[13]

## IV

In sum, any legitimate state interests can be satisfied fully through the use of a guided-discretion statute that ensures adherence to the constitutional mandate of heightened reliability in death-penalty determinations through individualized-sentencing procedures. Having reached unanimity on the constitutional significance of individualized sentencing in capital cases, we decline to depart from that mandate in this case today. We agree with the courts below that the statute under which respondent Shuman was sentenced to death did not comport with the Eighth and Fourteenth Amendments.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

[13] Elimination of the mandatory-sentencing procedure also eliminates the problem of the possibility of jury nullification which has been known to arise under mandatory schemes. See *Woodson* v. *North Carolina,* 428 U. S., at 293, 294, n. 29 (plurality opinion). If a jury does not believe that a defendant merits the death sentence and it knows that such a sentence will automatically result if it convicts the defendant of the murder charge, the jury may disregard its instructions in determining guilt and render a verdict of acquittal or of guilty of only a lesser included offense. The situation presented by a life-term inmate may present another jury nullification problem if the jury believes that the only manner of punishing a life-term inmate would be execution. In such circumstances undeserved convictions for capital murder could result. Although the jury may believe that the defendant is guilty only of manslaughter, it might still convict of the greater offense because the jurors believe there is no other means of punishment. The guided-discretion statutes that we have upheld, as

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Today the Court holds that the Eighth Amendment prohibits a State from imposing a mandatory death sentence on a prisoner who, while serving a life term for a first-degree murder conviction, murders a fellow inmate. The Court reasons that the Constitution requires that such an inmate be afforded the opportunity to present mitigating evidence to the sentencer, and, in so reasoning, quite obviously assumes that cases will arise under the type of statute at issue here in which an inmate will be able, through the presentation of such mitigating evidence, to persuade a sentencer not to impose a death sentence. In my view, the Constitution does not bar a state legislature from determining, in this limited class of cases, that, as a matter of law, no amount of mitigating evidence could ever be sufficient to outweigh the aggravating factors that characterize a first-degree murder committed by one who is already incarcerated for committing a previous murder and serving a life sentence. Accordingly, I dissent.

I dissented from the decisions holding that the Eighth Amendment prohibits the mandatory death-sentencing schemes involved in those cases. *Roberts (Stanislaus)* v. *Louisiana*, 428 U. S. 325, 358–363 (1976) (WHITE, J., joined by Burger, C. J., BLACKMUN and REHNQUIST, JJ., dissenting); *Woodson* v. *North Carolina*, 428 U. S. 280, 306–307 (1976). But even if those decisions are accepted opinions, neither they nor the other cases requiring individualized sentencing for capital defendants compel the result the Court reaches today. Indeed, the Court has expressly and repeatedly reserved the issue addressed in this case, see *Roberts (Stanislaus)* v. *Louisiana, supra,* at 334, n. 9; *Rob-*

---

well as the current Nevada statute, provide for bifurcated trials in capital cases to avoid nullification problems. Bifurcating the trial into a guilt-determination phase and a penalty phase tends to prevent the concerns relevant at one phase from infecting jury deliberations during the other.

*erts (Harry)* v. *Louisiana,* 431 U. S. 633, 637, n. 5 (1977); *Lockett* v. *Ohio,* 438 U. S. 586, 604, n. 11 (1978); *McCleskey* v. *Kemp,* 481 U. S. 279, 304, n. 26 (1987), signaling rather clearly that the rationale underpinning the individualized sentencing requirement does not inexorably lead to a conclusion that mandatory death-sentencing schemes of the type involved here offend the Constitution. Until today, the Court has never held that the Constitution prohibits a State from identifying an especially aggravated and exceedingly narrow category of first-degree murder, such as the crime for which respondent stands convicted, and determining as a matter of law and social policy that no combination of mitigating factors, short of an actual defense to the crime charged, could ever warrant reduction of a sentence of death. I thus do not accept the majority's assertion that "[t]he fact that a life-term inmate is convicted of murder does not reflect whether any circumstance existed at the time of the murder that may have lessened his responsibility for his acts even though it could not stand as a legal defense to the murder charge." *Ante,* at 78–79. An inmate serving a life sentence who is convicted of capital murder and who is *legally* responsible for his actions, that is, one who does not have a meritorious defense recognized as relieving the inmate of such responsibility, has, in my view, no constitutional right to persuade the sentencer to impose essentially no punishment at all for taking the life of another, whether guard or inmate.

I also reject the majority's assertion that this kind of mandatory capital-sentencing scheme is not necessary as a deterrent because the inmate who commits capital murder is still subject to the death penalty for that crime. See *ante,* at 82–83. But the majority holds that all inmates serving life sentences who commit capital murder must have the opportunity to persuade the sentencers that the death penalty should not be imposed. Moreover, the assumption is that some of them will succeed, thereby inevitably lessening the deterrent effect of the death penalty. As I see it, a State does not vio-

late the Eighth Amendment by maintaining the full deterrent effect of the death penalty in this kind of case and by insisting that those who murder while serving a life sentence without parole not be able to escape punishment for that crime.