O’Neill, J.,
dissenting.
{¶ 88} Respectfully, I must dissent.
{¶ 89} Shortly after I joined this court in 2013, we granted a motion to set an execution date for Jeffrey A. Wogenstahl. State v. Wogenstahl, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900. I dissented from the scheduling order on the theory that capital punishment violates the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution. Id. at ¶ 2. *81 Romell Broom’s first execution date — a botched attempt — was the example I offered to support my belief that even lethal injection is a cruel punishment on par with the “decapitations, hangings, and brandings” that were common in a less civilized time. Id. at ¶ 3-6.
{¶ 90} We have now come full circle. Broom is here once again on review of a successive petition for postconviction relief arguing, among other things, that a second execution attempt would constitute cruel and unusual punishment. Clearly, it would.
{¶ 91} The majority’s description of the state’s first attempt to put Broom to death chills me to the core. It is not only the rights of the defendant that are in play here. There are state employees who have tragically endured the personal trauma of unsuccessfully attempting to execute a fellow human being. And now we, as a society, are telling them, “Do it again.” I can only imagine the apprehension Broom and his executioners must be feeling now as they prepare for and await a second attempt.
{¶ 92} Once again, this case demonstrates that the term “lethal injection” is merely a convenient euphemism used to aid in turning a blind eye to the real possibility that execution procedures can and do go wrong with predictable and horrendous results. The phrase itself implies a sanitized death unlike the stories told in the media about Broom, Dennis McGuire, Charles Warner, Clayton Lockett, and others.[6] The record is clear that Broom was poked repeatedly with *82 a needle and that pain was unquestionably inflicted, not unlike procedures that have been recognized as torture in the past. See Wilkerson v. Utah, 99 U.S 130, 135, 25 L.Ed. 345 (1878) (public dissection is torture); Baze v. Rees, 553 U.S. 35, 94-99, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (Thomas, J., concurring) (dismemberment, cutting off hands or ears, and slitting nostrils are torture). Any fair reading of the record of the first execution attempt shows that Broom was actually tortured the first time. Now we embark on the task of doing it again.
{¶ 93} Today we have the rare opportunity to address not just the cruelty inherent in putting someone to death once — this case is about the second try. Incredibly, the majority cites the case of Willie Francis as support for its determination that the state does not violate the Eighth Amendment by undertaking a second execution attempt. Majority opinion at ¶ 23. Francis may be the only individual in the recent history of our nation who survived a first attempt at imposing the death penalty only to be successfully executed on the second attempt. I absolutely reject using the Francis case in defense of our tortured American history involving the death penalty. His very conviction is a look into the true tragedy of all executions in America. For let us not forget — ignoring the present case for the moment — that our national record is replete with examples of innocent people being executed. The Willie Francis case, tragically relied upon by the majority for the proposition that a second execution attempt is not on its face constitutionally defective, magnifies the problems of cruelty and racial injustice in one package and offers at once an instructive example of both the progress and regression of our justice system.
{¶ 94} If Willie Francis had been tried for his alleged crime today, he would not have been sent to the electric chair the first time. Francis was a 17-year-old black male in Louisiana on May 3, 1946, the first time the state attempted to put him to death. Miller & Bowman, Death by Installments: The Ordeal of Willie Francis 1, 20 (1988). He had been convicted by an all-white, all-male jury. Id. at 24. Six days after being appointed, his attorneys put up no defense despite a glaring lack of evidence. Id. at 23-26. Let me repeat that — this black teenager’s court-appointed attorneys offered no defense in a death-penalty case in the Deep South just after World War II. The state of Louisiana used two probably coerced confessions that were inconsistent with forensic evidence and the story of the only eyewitness to the murder. Id. at 23-26. He received a mandatory death sentence and was not informed of his rights to appeal or to appointed counsel for that purpose. Id. at 26-27. There was no appeal of his conviction or sentence. Id. And this is the case the majority relies upon to suggest that due process is alive and well in Ohio.
*83 {¶ 95} Since Francis was convicted and executed, our ideas of the United States Constitution have evolved substantially. Courts now recognize that it is a cruel and unusual punishment to execute a minor. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The right to a jury trial has evolved such that under current law, Francis could have challenged the selection of his all-white, all-male jury as well as the makeup of the pool from which the jurors were selected. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The right to counsel has evolved to the point where Francis’s conviction would have been overturned as a result of counsel’s objectively unreasonable choice not to defend, and he would have had appellate counsel to argue that issue for him. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Mandatory death sentences, like the one Francis was given, are now unconstitutional. Sumner v. Shuman, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). In all of these ways, our conception of the United States Constitution has evolved. I wonder when concepts of human dignity will evolve sufficiently that the state of Ohio will lay down the death penalty entirely just like the more obvious forms of torture that have been abandoned so far. See, e.g., Kennedy v. Louisiana, 554 U.S. 407, 419, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (“The [Eighth] Amendment ‘draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society),’ ” quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). This is because “[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.” Furman v. Georgia, 408 U.S. 238, 382, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting).
{¶ 96} On the precise question before this court — whether a second execution attempt violates the Eighth Amendment — the United States Supreme Court issued a fractured judgment resting entirely on a discredited theory of our Constitution. Francis was put to death with four justices agreeing with his Eighth Amendment argument, four disagreeing, and one justice believing that the Eighth Amendment did not apply to the states through the Fourteenth Amendment. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 472, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Burton, J., joined by Douglas, Murphy, and Rutledge, JJ., dissenting); id. at 464 (lead opinion); id. at 469-470 (Frankfurter, J., concurring). Our jurisprudence has evolved on this point as well, and the Eighth Amendment was formally incorporated in the Fourteenth Amendment as a *84 limitation upon the power of the states. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Katherine Mullin and T. Allan Regas, Assistant Prosecuting Attorneys, for appellee.
S. Adele Shank and Timothy F. Sweeney, for appellant.
Timothy Young, Ohio Public Defender, and Rachel Troutman, Assistant Public Defender, urging reversal for amicus curiae, Ohio Public Defender.
{¶ 97} Despite the quirk of constitutional theory that the judgment of the Francis court rests on, five of the justices were able to recognize the second execution attempt for what it was: torture. Resweber at 471 (Frankfurter, J., concurring) (“Strongly drawn as I am to some of the sentiments expressed by my brother Burton, * * * were I to [join the dissenting opinion,] I would be enforcing my private view rather than that consensus of society’s opinion which, for purposes of due process, is the standard enjoined by the Constitution”); id. at 476-477 (Burton, J., dissenting) (“[T]oday, two separated applications [of electricity] are sufficiently ‘cruel and unusual’ to be prohibited”); Miller & Bowman at 125-127 and fn. 18 (the Willie Francis case weighed “ ‘so heavily on [Justice Frankfurter’s] conscience’” that he convinced a former Harvard law school classmate, a leading member of the Louisiana bar, to seek clemency on Francis’s behalf), quoting Justice Burton’s papers, box 171, available in Library of Congress. In this way, we have regressed.
{¶ 98} I believe as a moral and constitutional matter that subjecting Broom to a second execution attempt after even one extremely painful and unsuccessful attempt is precisely the sort of “lingering death” that the United States Supreme Court recognized as cruel within the meaning of the Eighth Amendment 125 years ago. In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). For that reason, I would reverse the judgment of the court of appeals.
{¶ 99} Consequently, I dissent.

. The Christian Science Monitor reported in 2010 that “Broom was stuck with needles at least 18 times over the course of two hours” and that “[t]hat incident followed two others in Ohio during the past three years, both of which involved difficulties inserting the IV.” Guarino, Ohio Execution Set in Case that Changed Lethal Injection Process, Christian Science Monitor (Mar. 16, 2010), http:// www.esmonitor.com/USA/Justice/2010/0816/Ohio-execution-set-in-case-that-changed-lethal-injectionprocess (accessed Mar. 1, 2016). Ohio inmate Dennis McGuire “experienced ‘true pain and suffering’ ” during his successful execution as he “gasped, choked, clenched his fists and appeared to struggle against his restraints for about 10 minutes * * * before being pronounced dead.” Johnson, Dennis McGuire’s Execution Was Not ‘Humane, ’ Doctor Says, Columbus Dispatch (Aug. 13, 2014), http://www.dispatch.com/eontent/stories/local/2014/08/12/inmate-suffered-pain-during-exeeution-doctor-says.html (accessed Mar. 1, 2016), quoting a California anesthesiologist’s sworn statement from a civil suit filed by McGuire’s children. In Oklahoma, Charles Warner suffered five attempts at IV insertion and then exclaimed, “My body is on fire,” after executioners injected him with the wrong drug. Gajanan, Oklahoma Used Wrong Drug in Charles Warner’s Execution, Autopsy Report Says, The Guardian (Oct. 8, 2016), http://www.theguardian.com/us-news/2015/oct/08/ oklahoma-wrong-drug-execution-charles-warner (accessed Mar. 1, 2016). Clayton Lockett also suffered more than a dozen painful attempts at IV insertion. Stern, The Cruel and Unusual Execution of Clayton Lockett, The Atlantic (June 2015), http://www.theatlantic.com/magazine/ archive/2015/06/exeeution-clayton-locketf/ 392069/ (accessed Mar. 1, 2016). The drugs ultimately were administered to Lockett through an IV that had dislodged from his vein. Consequently, the drugs pooled under his skin and entered his bloodstream more slowly, and he received only a partial dose of the sedative midazolam before he died. In the meantime, Lockett was able to wake up, struggle with his restraints strongly enough to cause “blunt-impact injuries” to himself, and *82 managed to say the word “Man” among other, incoherent mumbling. Id. Lockett died “slowly and in apparent agony” while the medical team attempted to reinsert his IV. Id.