Justice Thomas,
with whom Justice Scalia joins, dissenting.
Today, the Court holds that “mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment’s prohibition on ‘cruel and unusual punishments.’ ” Ante, at 465. To reach that result, the Court relies on two lines of precedent. The first involves the categorical prohibition of certain punishments for specified classes of offenders. The second requires individualized sentencing in the capital punishment context. Neither line is consistent with the original understanding of the Cruel and Unusual Punishments Clause. The Court compounds its errors by combining these lines of precedent and extending them to reach a result that is even less legitimate than the foundation on which it is built. Because the Court upsets the legislatively enacted sentencing regimes of 29 jurisdictions without constitutional warrant, I respectfully dissent.[1]
I
The Court first relies on its cases “adopt[ing] categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty.” Ante, at 470. Of these categorical proportional *503 ity cases, the Court places particular emphasis on Roper v. Simmons, 543 U. S. 551 (2005), and Graham v. Florida, 560 U. S. 48 (2010). In Roper, the Court held that the Constitution prohibits the execution of an offender who was under 18 at the time of his offense. 543 U. S., at 578. The Roper Court looked to, among other things, its own sense of parental intuition and “scientific and sociological studies” to conclude that offenders under the age of 18 “cannot with reliability be classified among the worst offenders.” Id., at 569. In Graham, the Court relied on similar considerations to conclude that the Constitution prohibits a life-without-parole sentence for a nonhomicide offender who was under the age of 18 at the time of his offense. 560 U. S., at 74.
The Court now concludes that mandatory life-without-parole sentences for duly convicted juvenile murderers “con-traven[e] Graham’s (and also Roper’s) foundational principle: that imposition of a State’s most severe penalties on juvenile offenders cannot proceed as though they were not children.” Ante, at 474. But neither Roper nor Graham held that specific procedural rules are required for sentencing juvenile homicide offenders. And, the logic of those cases should not be extended to create such a requirement.
The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, provides that: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” As I have previously explained, “the Cruel and Unusual Punishments Clause was originally understood as prohibiting torturous methods of punishment—specifically methods akin to those that had been considered cruel and unusual at the time the Bill of Rights was adopted.” Graham, supra, at 99 (dissenting opinion) (internal quotation marks and citations omitted).[2] The Clause does not contain a “proportionality *504 principle.” Ewing v. California, 538 U. S. 11, 32 (2003) (Thomas, J., concurring in judgment); see generally Harmelin v. Michigan, 501 U. S. 957, 975-985 (1991) (opinion of Scalia, J.). In short, it does not authorize courts to invalidate any punishment they deem disproportionate to the severity of the crime or to a particular class of offenders. Instead, the Clause “leaves the unavoidably moral question of who ‘deserves’ a particular nonprohibited method of punishment to the judgment of the legislatures that authorize the penalty.” Graham, supra, at 101 (Thomas, J., dissenting).
The legislatures of Arkansas and Alabama, like those of 27 other jurisdictions, ante, at 482, have determined that all offenders convicted of specified homicide offenses, whether juveniles or not, deserve a sentence of life in prison without the possibility of parole. Nothing in our Constitution authorizes this Court to supplant that choice.
1—1 )—l
To invalidate mandatory life-without-parole sentences for juveniles, the Court also relies on its cases “prohibit[ing] mandatory imposition of capital punishment.” Ante, at 470. The Court reasons that, because Graham compared juvenile life-without-parole sentences to the death penalty, the “distinctive set of legal rules” that this Court has imposed in the capital punishment context, including the requirement of individualized sentencing, is “relevant” here. Ante, at 475. But even accepting an analogy between capital and juvenile life-without-parole sentences, this Court’s cases pro *505 hibiting mandatory capital sentencing schemes have no basis in the original understanding of the Eighth Amendment, and, thus, cannot justify a prohibition of sentencing schemes that mandate life-without-parole sentences for juveniles.
A
In a line of cases following Furman v. Georgia, 408 U. S. 238 (1972) (per curiam), this Court prohibited the mandatory imposition of the death penalty. See Woodson v. North Carolina, 428 U. S. 280 (1976) (plurality opinion); Roberts v. Louisiana, 428 U. S. 325 (1976) (same); Sumner v. Shuman, 483 U. S. 66 (1987). Furman first announced the principle that States may not permit sentencers to exercise unguided discretion in imposing the death penalty. See generally 408 U. S. 238. In response to Furman, many States passed new laws that made the death penalty mandatory following conviction of specified crimes, thereby eliminating the offending discretion. See Gregg v. Georgia, 428 U. S. 153, 180-181 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). The Court invalidated those statutes in Woodson, Roberts, and Sumner. The Court reasoned that mandatory capital sentencing schemes were problematic, because they failed “to allow the particularized consideration” of “relevant facets of the character and record of the individual offender or the circumstances of the particular offense.” Woodson, supra, at 303-304 (plurality opinion).[3]
*506 In my view, Woodson and its progeny were wrongly decided. As discussed above, the Cruel and Unusual Punishments Clause, as originally understood, prohibits “torturous methods of punishment.” See Graham, 560 U. S., at 99 (Thomas, J., dissenting) (internal quotation marks omitted). It is not concerned with whether a particular lawful method of punishment—whether capital or noncapital—is imposed pursuant to a mandatory or discretionary sentencing regime. See Gardner v. Florida, 430 U. S. 349, 371 (1977) (Rehnquist, J., dissenting) (“The prohibition of the Eighth Amendment relates to the character of the punishment, and not to the process by which it is imposed”). In fact, “[i]n the early days of the Republic,” each crime generally had a defined punishment “prescribed with specificity by the legislature.” United States v. Grayson, 438 U. S. 41, 45 (1978). Capital sentences, to which the Court analogizes, were treated no differently. “ [Mandatory death sentences abounded in our first Penal Code” and were “common in the several States— both at the time of the founding and throughout the 19th century.” Harmelin, supra, at 994-995; see also Woodson, supra, at 289 (plurality opinion) (“At the time the Eighth Amendment was adopted in 1791, the States uniformly followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses”). Accordingly, the idea that the mandatory imposition of an otherwise-constitutional sentence renders that sentence cruel and unusual finds “no support in the text and history of the Eighth Amendment.” Harmelin, supra, at 994.
Moreover, mandatory death penalty schemes were “a perfectly reasonable legislative response to the concerns expressed in Furman” regarding unguided sentencing discretion, in that they “eliminat[ed] explicit jury discretion and treat[ed] all defendants equally.” Graham v. Collins, 506 U. S. 461, 487 (1993) (Thomas, J., concurring). And, as Justice White explained more than 30 years ago, “a State is not constitutionally forbidden to provide that the commission of certain crimes conclusively establishes that a criminal's char *507 acter is such that he deserves death.” Roberts, supra, at 358 (dissenting opinion). Thus, there is no basis for concluding that a mandatory capital sentencing scheme is unconstitutional. Because the Court’s cases requiring individualized sentencing in the capital context are wrongly decided, they cannot serve as a valid foundation for the novel rule regarding mandatory life-without-parole sentences for juveniles that the Court announces today.
B
In any event, this Court has already declined to extend its individualized-sentencing rule beyond the death penalty context. In Harmelin, the defendant was convicted of possessing a large quantity of drugs. 501 U. S., at 961 (opinion of Scalia, J.). In accordance with Michigan law, he was sentenced to a mandatory term of life in prison without the possibility of parole. Ibid. Citing the same line of death penalty precedents on which the Court relies today, the defendant argued that his sentence, due to its mandatory nature, violated the Cruel and Unusual Punishments Clause. Id., at 994-995 (opinion of the Court).
The Court rejected that argument, explaining that “[tjhere can be no serious contention ... that a sentence which is not otherwise cruel and unusual becomes so simply because it is ‘mandatory.’” Id., at 995. In so doing, the Court refused to analogize to its death penalty cases. The Court noted that those cases had “repeatedly suggested that there is no comparable [individualized-sentencing] requirement outside the capital context, because of the qualitative difference between death and all other penalties.” Ibid. The Court observed that, “even where the difference” between a sentence of life without parole and other sentences of imprisonment “is the greatest,” such a sentence “cannot be compared with death.” Id., at 996. Therefore, the Court concluded that the line of cases requiring individualized sentencing had been drawn at capital cases, and that there was “no basis for extending it further.” Ibid.
*508 Harmelin’s reasoning logically extends to these cases. Obviously, the younger the defendant, “the great[er]” the difference between a sentence of life without parole and other terms of imprisonment. Ibid. But under Harmelin’s, rationale, the defendant’s age is immaterial to the Eighth Amendment analysis. Thus, the result in today’s cases should be the same as that in Harmelin. Petitioners, like the defendant in Harmelin, were not sentenced to death. Accordingly, this Court’s cases “creating and clarifying the individualized capital sentencing doctrine” do not apply. Id., at 995 (internal quotation marks omitted). Nothing about our Constitution, or about the qualitative difference between any term of imprisonment and death, has changed since Harmelin was decided 21 years ago. What has changed (or, better yet, “evolved”) is this Court’s ever-expanding line of categorical proportionality eases. The Court now uses Roper and Graham to jettison Harmelin’s clear distinction between capital and noncapital cases and to apply the former to noncapital juvenile offenders.[4] The Court’s decision to do so is even less supportable than the precedents used to reach it.
V-H HH f-H
As The Chief Justice notes, ante, at 500 (dissenting opinion), the Court lays the groundwork for future incursions on the States’ authority to sentence criminals. In its categorical proportionality cases, the Court has considered “ ‘objective indicia of society’s standards, as expressed in legislative enactments and state practice’ to determine whether *509 there is a national consensus against the sentencing practice at issue.” Graham, 560 U. S., at 61 (quoting Roper, 543 U. S., at 563). In Graham, for example, the Court looked to “[a]ctual sentencing practices” to conclude that there was a national consensus against life-without-parole sentences for juvenile nonhomicide offenders. 560 U. S., at 62-65; see also Roper, supra, at 564-565; Atkins v. Virginia, 536 U. S. 304, 316 (2002).
Today, the Court makes clear that, even though its decision leaves intact the discretionary imposition of life-without-parole sentences for juvenile homicide offenders, it “think[s] appropriate occasions for sentencing juveniles to [life without parole] will be uncommon.” Ante, at 479. That statement may well cause trial judges to shy away from imposing life-without-parole sentences and embolden appellate judges to set them aside when they are imposed. And, when a future petitioner seeks a categorical ban on sentences of life without parole for juvenile homicide offenders, this Court will most assuredly look to the “actual sentencing practices” triggered by these cases. The Court has, thus, gone from “merely” divining the societal consensus of today to shaping the societal consensus of tomorrow.
* ⅜ *
Today’s decision invalidates a constitutionally permissible sentencing system based on nothing more than the Court’s belief that “its own sense of morality . . . pre-empts that of the people and their representatives.” Graham, supra, at 124 (Thomas, J., dissenting). Because nothing in the Constitution grants the Court the authority it exercises today, I respectfully dissent.

 I join The Chief Justice’s opinion because it accurately explains that, even accepting the Court’s precedents, the Court’s holding in today’s cases is unsupportable.

 Neither the Court nor petitioners argue that petitioners' sentences would have been among “the ‘modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted.’ ” Graham, 560 U. S., at 106, n. 3 (Thomas, J., dissenting) (quot *504 ing Ford v. Wainwright, 477 U. S. 399, 405 (1986)). Nor could they. Petitioners were 14 years old at the time they committed their crimes. When the Bill of Rights was ratified, 14-year-olds were subject to trial and punishment as adult offenders. See Roper v. Simmons, 543 U. S. 551, 609, n. 1 (2005) (Scalia, J., dissenting). Further, mandatory death sentences were common at that time. See Harmelin v. Michigan, 501 U. S. 957, 994-995 (1991). It is therefore implausible that a 14-year-old’s mandatory prison sentence—of any length, with or without parole—would have been viewed as cruel and unusual.

 The Court later extended Woodson, requiring that capital defendants be permitted to present, and sentencers in capital eases be permitted to consider, any relevant mitigating evidence, including the age of the defendant. See, e. g., Lockett v. Ohio, 438 U. S. 586, 597-608 (1978) (plurality opinion); Eddings v. Oklahoma, 455 U. S. 104, 110-112 (1982); Skipper v. South Carolina, 476 U. S. 1, 4-5 (1986); Johnson v. Texas, 509 U. S. 350, 361-368 (1993). Whatever the validity of the requirement that sentencers be permitted to consider all mitigating evidence when deciding whether to impose a nonmandatory capital sentence, the Court certainly was wrong to prohibit mandatory capital sentences. See Graham v. Collins, 506 U. S. 461, 488-500 (1993) (Thomas, J., concurring).

 In support of its decision not to apply Harmelin to juvenile offenders, the Court also observes that “ ‘[o]ur history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults.’” Ante, at 481 (quoting J. D. B. v. North Carolina, 564 U. S. 261, 274 (2011); some internal quotation marks omitted). That is no doubt true as a general matter, but it does not justify usurping authority that rightfully belongs to the people by imposing a constitutional rule where none exists.