

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00181-CR

_____


DA RYAN TARRELL SIMMS, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 368th District Court
Williamson County, Texas
Trial Court No. 14-2212-K277


Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

After receiving a tip regarding a possible homicide, the Williamson County[1] Sheriff's Department (the Department) sent officers to the Round Rock address provided by the tipster, where they discovered the decomposing body of Jerrod Stanford. Subsequent information provided by a jailhouse informant and an accomplice, as well as other evidence gathered in the investigation, led to the indictment and conviction of Da Ryan Tarrell Simms for capital murder,[2] and the imposition of a mandatory sentence of life imprisonment without parole.

On appeal, Simms challenges the sufficiency of the evidence corroborating the testimony of the accomplice witness and the jailhouse witness, complains that the trial court abused its discretion by denying his motion for mistrial during voir dire and erred by failing to include a benefit-of-the-doubt instruction in the jury charge, and asserts that the imposition of a sentence of life without parole violated his rights under the Eighth Amendment to the United States Constitution. We affirm the trial court's judgment, because we find that (1) sufficient evidence beyond the accomplice and jailhouse witnesses tends to connect Simms to the murder, (2) the trial court did not err in denying Simms' motion for mistrial, (3) the trial court did not err in failing to sua sponte include a benefit-of-the-doubt instruction in its jury charge, and (4) Simms' sentence of life without parole does not violate the Eighth Amendment.

---

[1]Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between precedent of the Third Court of Appeals and the precedent of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 19.03(a)(2).

*(1)    Sufficient Evidence Beyond the Accomplice and Jailhouse Witnesses Tends to Connect Simms to the Murder*

At trial, the State relied heavily on the testimony of Lindsey Hanks,[3] an accomplice to the murder, and Leroy Hall,[4] a jailhouse informant, to secure Simms' conviction. The Texas Code of Criminal Procedure provides that a defendant may not be convicted of an offense "on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14. Similarly,

> A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075(a) (Supp.). Under both statutes, corroboration is insufficient if the corroborating evidence only shows that an offense was committed. TEX. CODE CRIM. PROC. ANN. arts. 38.14, 38.075(b).

---

[3]Hanks, who met Stanford after he contacted her via an online site advertising escort services, testified extensively regarding the murder and robbery of Stanford and Simms' involvement in both. After her initial encounter with Stanford, Hanks told Simms and Kendall Ellis about Stanford and Stanford's stash of drugs, money, guns, and other possessions. When Stanford contacted her again, Simms insisted that he and Ellis accompany her to Stanford's house. Hanks entered the house alone, but Simms and Ellis followed after a short while armed with guns. When Stanford tried to run to his bedroom, Simms and Ellis followed, and Hanks heard a loud bang and then another loud bang. Hanks followed and saw Stanford lying face down on the bathroom floor, bleeding, and saw Simms and Ellis in the closet going through things. Based on Simms' statement to her, Hanks believed he shot Stanford. Simms and Ellis put a number of items from the house in Hanks' car before they left. Hanks also testified that she, Simms, and Jerrion Barr returned a couple of days later, took more items from the house, and stole Stanford's Avalanche truck.

[4]Hall testified that he was a cellmate of Simms in the Williamson County jail about a month after the murder. While they were cellmates, Simms told him that he had a girl who was a prostitute who told him about a "trick" that grew weed and had money, guns, and jewelry. Simms said he and his brothers planned to bust into the house while the girl and the trick were having sex, beat him up a little, and take what they could. When Simms, Ellis, and the prostitute entered the house, the girl and the trick were in the bathroom, where they scuffled with him. The trick would not give in, so Simms shot him. They stole the man's wallet, checkbook, gold chain, jewelry, and his truck keys. Later, they returned and took the man's truck. Hall also testified that Simms told him that he was wearing Air Jordan Retro 11 shoes and that he gave them to his little brother because they were blood stained.

3

In his first and second points of error, Simms argues that the non-accomplice and non-jailhouse evidence is insufficient to connect him to the offense. Although neither statute provides that jailhouse-witness testimony may not corroborate accomplice-witness testimony, or vice versa, Simms argues that the statutes were both enacted because the Legislature recognized that both accomplice-witness testimony and jailhouse-witness testimony are inherently unreliable because of the incentive of both of these types of witnesses to better their circumstances. *See Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015) (jailhouse witness); *Beathard v. State*, 767 S.W.2d 423, 429 (Tex. Crim. App. 1989) (accomplice witness). Consequently, he argues, we should not consider Hall's testimony to corroborate Hanks' or vice versa.[5] The State argues that sufficient evidence connects Simms to the offense, without considering the testimony of Hall and Hanks. We agree.

The standard for corroboration of jailhouse-witness testimony under Article 38.075 is identical to the standard for corroboration of accomplice witness testimony under Article. 38.14. *Hernandez v. State*, No. 03-10-00863-CR, 2013 WL 3723203, at *3 (Tex. App.—Austin July 11,

---

[5]The Texas Court of Criminal Appeals has long held that Article 38.14 does not allow one accomplice witness to corroborate the testimony of another accomplice witness. *Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971). However, the Court has not directly addressed whether accomplice-witness testimony may be corroborated by jailhouse-witness testimony, or vice versa. *See Mata v. State*, 542 S.W.3d 582, 582–83 (Tex. Crim. App. 2018) (Hervey, J., concurring). Our sister courts of appeals considering the issue have reached conflicting results. *Compare Phillips v. State*, No. 10-12-00164-CR, 2015 WL 7443625, at *2 (Tex. App.—Waco Nov. 19, 2015, pet. ref'd) (mem. op., not designated for publication) (holding trial court did not err in refusing to include an instruction that the testimony of jailhouse witnesses could not corroborate testimony of accomplice witness because such a limitation was not supported by any authority), *with Patterson v. State*, 204 S.W.3d 852, 858–59 (Tex. App.—Corpus Christi 2006, pet. ref'd) (holding that jailhouse informant witness testimony may not corroborate testimony of an accomplice witness). We need not decide this issue since sufficient non-accomplice- and non-jailhouse-witness testimony tends to connect Simms to the offense.

2013, no pet.) (mem. op., not designated for publication)[6] (citing *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland, pet. ref'd); *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi 2011, no pet.); *Brooks v. State*, 357 S.W.3d 777, 781 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Watkins v. State*, 333 S.W.3d 771, 778 (Tex. App.—Waco 2010, pet. ref'd). Under this standard, we eliminate the jailhouse-witness and accomplice-witness testimony and examine the remainder of the record to determine if there is any evidence that tends to connect the accused with the commission of the offense. *Id.* at *4 (citing *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) (corroboration of accomplice-witness testimony); *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi 2011, no pet.) (corroboration of jailhouse-informant testimony)). There is "sufficient corroboration if [the remaining evidence] shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id.* (quoting *Smith*, 332 S.W.3d at 442). Corroboration evidence may be direct or circumstantial. *Id.*

We view the corroborating evidence in the light most favorable to the jury's verdict. *Id.* at *5. Therefore, "when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact-finder's resolution of the evidence." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)). We do not independently construe the corroborating evidence; rather, we "consider the combined force of all the corroborating evidence

---

[6]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

5

that tends to connect the accused with the offense." *Hernandez*, 2013 WL 3723203, at *4 (citing *Cox v. State*, 830 S.W.2d 609, 611–12 (Tex. Crim. App. 1992); *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988)). "[P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Smith*, 332 S.W.3d at 443 (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993) (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984))). Sometimes apparently insignificant incriminating circumstances may be sufficient evidence of corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999) (en banc).

Excluding Hanks' and Hall's testimony, the relevant evidence at trial showed that the Department received a tip originating from the Travis County Jail on September 16, 2014. According to the informant, there was a possible homicide at an address in Round Rock and one of the participants was Hanks. On investigation, the Department discovered that the house had been ransacked and that Stanford's decomposing body was on the floor of the master bedroom. Stanford had been shot once in the back and once in the chest, and a significant amount of blood and plasma was on the bathroom floor.

A spent .38 caliber casing was found in a sofa in the living room, and a second one was found in the bathtub. Both of the casings were Remington R & P .38 automatic shell casings. Mallory Foster, a forensic scientist at the Texas Department of Public Safety Laboratory in Austin, testified that her analysis showed that both of the casings were fired from the same weapon. Analysis also showed that the two bullets recovered from Stanford's body were consistent with

6

.38 caliber automatic, hollow-point bullets and that they were fired from the same weapon. She also testified that three unfired cartridges seized at the time of Simms' arrest were visually consistent with both the spent casings found in Stanford's house and the bullets recovered from his body. Foster clarified that she could not say that the spent casings and the bullets recovered from Stanford's body were fired from the same weapon, or that these bullets came from the same box as the three unfired cartridges.

Stanford's body was positioned with his torso lying between a wall and a half-wall separating the bathtub from the shower, his feet near the door leading to the master bedroom, and his head at the door of a closet. The closet had been ransacked and was in disarray. An empty gun case was found inside the closet. On the ledge atop the half-wall above Stanford's body, a latent palm print was found that was matched to Simms' known left palm print. Jennifer Smith, supervisor of Crime Scene and Evidence for the Department, testified that this ledge was processed for latent prints on the day Stanford's body was discovered because the body blocked access to the closet without touching the ledge. She also testified that the positioning of the latent palm print was consistent with someone leaving the closet. Also on the bathroom floor near the body was a bloody shoe print that was consistent with the print of an Air Jordan Retro 11 shoe.

Next to Stanford's body was an empty wallet. A pizza box in the kitchen had a delivery receipt dated September 4, 2014, and Stanford's name. An identification badge with Stanford's name was also found at the edge of the driveway, and Stanford's passport was found in the bathroom. By running his name, the investigators found that a 2009 Chevy Avalanche was registered in Stanford's name. Since it was not at the residence, they advised all law enforcement

7

in the area to be on the lookout for the vehicle. In the course of the investigation, a McDonald's security video from the morning of September 10, 2014, was recovered. The video showed a silver Dodge Charger driven by Hanks pull into the parking lot, followed by a black Avalanche. After the Charger left and returned, a white man got out of the Charger and into the Avalanche, and both vehicles left. Simms was not seen on the video.

Suzanne Manbeck, Stanford's best friend, testified that Stanford owned between seven and ten rifles and handguns. One of the handguns was white to cream in color with a brown/black handle. She identified State's Exhibit 131, which was a photograph of a handgun recovered incident to Simms' arrest, as a handgun owned by Stanford.

Investigators learned that Simms had been arrested with Kendall Ellis and Jerrion Barr in Austin on September 14, 2014, on unrelated charges. Branden Kunkel, the Austin police officer who arrested Simms, testified that, at 1:00 a.m. that morning, he received a report that shots had been fired ten minutes earlier in the 1100 block of Thurgood Circle and that the caller heard cars racing up the street. When Kunkel arrived on the block he saw a black Kia in which three heads appeared to be peeking over the dashboard. He passed the vehicle, turned around to run the license plate, and called for backup. He then saw a male, who he later identified as Simms, get out of the rear passenger side door, talking on his cell phone. At that point, Kunkel told him to stop. The man mumbled something and reached for the rear door, and Kunkel restrained him in handcuffs and took him to his patrol car. When backup arrived, they removed the other two occupants, smelled marihuana, and searched the vehicle. He also searched Simms and found marihuana, Xanax bars, and a cleaning cloth for guns.

8

Joshua Muchnikoff, another Austin police officer, responded to Kunkel's backup call. When he arrived, Simms was in custody, and he detained the other two occupants, who were in the front seat. They were identified as Ellis and Barr. When the car was searched, the tan CZ 40 pistol shown in State's Exhibit 131 was found on the floorboard of the rear passenger-side seat, leaning against the back seat. A magazine was found in the pistol, and another loaded magazine was found in the glove box. The pistol also had a round in the chamber. A partial box of Remington .38 cartridges was found in the center console between the front seats.

Investigators also obtained a partial list of rifles and handguns owned by Stanford from his father. One of the rifles on the list, a Martin .35 caliber rifle, was recovered at a pawn shop. The rifle had been pawned by Barr on September 6, 2014, at 2:35 p.m.

After investigators were notified that three charges had been made on one of Stanford's credit card accounts at a Speedy Stop in Austin on September 7, 2014, they obtained the security video from that day. The video showed Ellis exit Hanks' Dodge Charger, enter the store, and purchase some items. The driver of the Dodge Charger was not seen.

Based on this evidence, Stanford's murder occurred sometime between the afternoon of September 4, after the pizza was delivered, and the early afternoon of September 6, when Barr pawned one of Stanford's rifles. The first piece of evidence that tends to connect Simms to the offense is his left palm print that was found on the ledge above Stanford's body. That print establishes that Simms was present in the bathroom at some time. Simms argues that the print could have been placed there at any time, even before the murder. However, there was no evidence that Simms had been in Stanford's house, or that he had any reason to be in the house, before the

9

murder. Therefore, the palm print is circumstantial evidence that Simms was present in the bathroom either when or sometime after Stanford was shot. *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007). "Mere presence of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony." *Beathard*, 767 S.W.2d at 428. However, when coupled with other suspicious circumstances, proof that the defendant was at or near the crime scene at or about the time of the commission of the offense may tend to connect the defendant to the offense and furnish sufficient corroboration. *Id*. at 430.

The location of the palm print on the ledge above Stanford's body is one such suspicious circumstance. The evidence showed that Stanford's body was blocking access to the closet, which had been ransacked, and that it would be necessary to use the ledge as support to step over the body. While not sufficient in itself to connect Simms to the offense, this suspicious circumstance does provide a supportive link to that connection.

When Simms was arrested on unrelated charges at least eight days after the murder, Stanford's pistol was found on the floorboard, leaning on the rear passenger-side seat where Simms had been sitting. On his person at the time was a gun-cleaning rag that Officer Muchnikoff testified smelled of solvents and was stained with carbon. Although there were other people in the vehicle, the jury could rationally infer that the proximity of the pistol to where Simms had been seated indicated that he had possessed the pistol and had set it down before exiting the vehicle. Because of the passage of time, Simms' possession of Stanford's pistol is not sufficient evidence by itself to connect him to the offense. However, it is a supporting suspicious circumstance that tended to connect him to the offense when considered with the other evidence.

10

In addition, at the time of his arrest, Simms was a passenger in a vehicle that also contained Ellis and Barr, both of whom had been in possession of property stolen from Stanford shortly after he was murdered. Also recovered from the vehicle was a partial box of Remington .38 cartridges that were visually similar to both the spent .38 casings found at Stanford's residence and the bullets recovered from his body. Evidence that the defendant was in the company of the accomplice or others implicated in the offense near the time of the offense may be corroborative evidence. *Gaston v. State*, 324 S.W.3d 905, 909 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). However, guilt by association will not. *Id.* Since Simms was in the company of Ellis and Barr at least eight days after the murder, this could not be considered corroborative evidence. Nevertheless, the jury could have viewed these suspicious circumstances, when coupled with the other evidence, as tending to connect Simms to the offense.[7]

While none of this evidence, taken alone, would be sufficient to connect Simms to the offense, "we must not take a 'divide and conquer approach' but must instead 'consider the combined force of all of the non-accomplice evidence.' *Harkey v. State*, No. 03-14-00734-CR,

---

[7]In its brief, the State points to two other pieces of evidence that it asserts tend to connect Simms to the offense. First, it points to the bloody shoe print, which was consistent with an Air Jordan Retro 11. The State contends that this detail was unknown to the public and therefore is corroborative of Hall's testimony that Simms told him he was wearing that type of shoe at the time of the murder, citing *Ruiz*, 358 S.W.3d at 681. However, *Ruiz* relied on *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005), which was decided before the enactment of Article 38.075 of the Texas Code of Criminal Procedure, the jailhouse-witness-corroboration statute, so the continued viability of this holding is questionable. Since, under Article 38.075, we must exclude the jailhouse-witness testimony in considering corroborating evidence, and there was no other evidence that Simms was wearing that type of shoe at the time of the offense, the bloody shoe print does not tend to connect Simms to the offense.

The State also points to the gold chain that Simms was wearing at the time of his arrest as corroborative evidence. However, while there was testimony that Stanford owned a gold chain that was missing after the murder, there was no description or photograph of the gold chain admitted into evidence. Further, Simms put on evidence of screen shots of photographs that showed him wearing a gold chain on August 28, 2014, and September 3, 2014, that was visually similar to the one he was wearing at the time of his arrest. On this record, the gold chain worn by Simms did not tend to connect him to the offense.

2016 WL 1084541, at *3 (Tex. App.—Austin Mar. 15, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Smith*, 332 S.W.3d at 442). We believe a rational jury could find that the presence of his palm print directly above Stanford's body, in combination with the other suspicious circumstances, sufficiently tended to connect Simms to the offense.[8] *See Smith*, 332 S.W.3d at 442. We recognize, as Simms ably sets forth in his brief, that there are other views of this evidence that would tend not to connect Simms to the offense. Nevertheless, we must defer to the view of the evidence that supports the jury's finding. *See id.* We overrule Simms' corroboration issues.

*(2)     The Trial Court Did Not Err in Denying Simms' Motion for Mistrial*

Simms also complains that the trial court abused its discretion by denying his motion for mistrial during voir dire of the jury venire. Simms' motion was based on the following exchange with a venire member, which came toward the end of his voir dire:

> VENIREPERSON: Excuse me.
>
> [SIMMS' COUNSEL]: Yes, ma'am, No. 12? Yes, ma'am?
>
> VENIREPERSON: I have a history about anxiety attack. . . . And, also, I can't take too much stress.
>
> [SIMMS' COUNSEL]: Okay.
>
> VENIREPERSON: But I have a question here.
>
> [SIMMS' COUNSEL]: Okay.
>
> VENIREPERSON: A person died. A human value, does that mean anything to you guys? All you guys talk about is how to get out of the – this

---

[8]Simms was charged with capital murder during the course of committing a robbery, and the jury was instructed on party liability. The non-accomplice- and non-jailhouse-witness testimony was sufficient to at least connect Simms to the robbery. In a capital murder case, "a defendant's presence at the scene and participation in the underlying offense [are] sufficient to connect him to the capital murder for accomplice-witness rule purposes." *Solomon v. State*, 49 S.W.3d 356, 362 (Tex. Crim. App. 2001).

12

criminal cases. Did you ever first think about in the court date, that day those families sit there, they lost their families. And you guys here, back and forth, to protect somebody who we think is guilty. Do you think that's the right thing to do? I don't feel good. I listen to all this. I forgot to take my medicine today, but I didn't know I come here, would have this kind of stress from you guys. But I don't think it's fair for the dead person. Does anybody care about the dead person's family, how they feel about this when they sit here tomorrow, the court date?

[SIMMS' COUNSEL]: Ma'am, I don't want you to think that I'm making light about anybody's death, because I'm not. And Mr. McWilliams isn't --

VENIREPERSON: No. You guys beating up bushes, around here, around -- to brainwash everybody here trying to make everybody think that this person is not guilty. But the problem is a person is dead. The person never can come back again. This person is dead. He can't claim for himself, "I got shot. I'm dead. Who is to speak up for me?" I thought a court supposed to be fair, supposed to have justice. So where is justice come from for that person?

[SIMMS' COUNSEL]: Okay. Calm down. I don't want you to get sick. Okay?

VENIREPERSON: I try to convince myself this is right thing here. But the more I listen, the more I feel confused. I'm really confused.

At this point the trial court sua sponte asked counsel to approach, and a bench conference ensued:

[THE STATE]: We'll agree to let her go, Judge.

THE COURT: We're going to let her go.

[SIMMS' COUNSEL]: Yeah. I would certainly agree to let her go, Judge. But I think that in light of her comments there, I don't know if Mr. Simms can continue to get a fair trial with this particular panel. That's pretty bad and pretty damaging to the panel.

THE COURT: Well, I know, but I don't think we're going to get there at this point, so --

[SIMMS' CO-COUNSEL]: She accused us of brainwashing the panel in front of 120 people.

13

[STATE'S CO-COUNSEL]: I will make a statement to the jury that the State doesn't believe for one second that Mr. Evans is trying to brainwash this panel.

THE COURT: We're fine. Yeah.

[SIMMS' COUNSEL]: So the motion for mistrial is overruled, Your Honor?

THE COURT: Motion for mistrial is overruled.

The venire member was then excused and removed from the courtroom. Counsel for Simms then told the venire:

Ladies and gentlemen, I'm going to tell you, the last thing on this earth that I am trying to do is brainwash anyone. The last thing on this earth that Mr. McWilliams is trying to do is brainwash anybody. We're trying to keep this -- he and I both know this is very serious, and we both know that someone has been lost. We make no fun of that. We're just trying to keep this as interesting as we can. And if anybody takes offense, please, I'm sorry, I don't mean to offend you. I know Mr. McWilliams doesn't mean to offend you. But whatever I do, Mr. McCabe does, please don't hold it against Mr. Simms if something that we have done offends you. Okay?

On appeal, Simms complains about the entire statement made by the venire member, beginning with "[a] person died, don't you guys worry about that" and ending with "[s]o where is justice for that person." Although he acknowledges that he did not request an instruction to the jury from the trial court, he argues that the venire member's statement that Simms was guilty and accusing his counsel of brainwashing the venire irreparably tainted the venire.

The preferred procedure to present a complaint and preserve error at trial is to (1) make a timely objection, (2) request an instruction to disregard the prejudicial comment, and (3) move for a mistrial if the instruction to disregard is insufficient to cure the prejudice. *Unkart v. State*, 400 S.W.3d 94, 98–99 (Tex. Crim. App. 2013); *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App.

14

2007). While this is the preferred sequence, the only essential requirement to preserve the complaint for appellate review is a timely, specific request that is refused by the trial court. *Cruz*, 225 S.W.3d at 548; *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004)).

Nevertheless, a party's failure to follow the sequence affects the scope of appellate review. A timely objection is preemptive, informs the court of the potential for error, and conserves judicial resources by preventing foreseeable, harmful events. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). An instruction to disregard attempts to cure any prejudice that may have occurred, and, if the prejudice is curable, eliminates the need for a mistrial. *Id.* A motion for mistrial also seeks to correct prejudice that has already occurred. However, a mistrial is "reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not cure, the prejudice stemming from an event at trial—i.e., where an instruction would not leave the jury in an acceptable state to continue the trial." *Id.* Thus,

> when a party's first action is to move for mistrial, as this appellant's was, the scope of appellate review is limited to the question whether the trial court erred in not taking the most serious action of ending the trial; in other words, an event that could have been prevented by timely objection or cured by instruction to the jury will not lead an appellate court to reverse a judgment on an appeal by the party who did not request these lesser remedies in the trial court.

*Id.* at 70; *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007).

In this case, Simms never objected to the venire member's comments, rather the trial court intervened sua sponte to end the exchange. Most of the venire member's comments, and any resulting prejudice, would have been prevented if Simms had timely objected when the venire member first accused his counsel of "protect[ing] somebody who we think is guilty," which should have alerted that the member presumed Simms' guilt before any evidence was heard. A timely

objection after this statement would have prevented the lengthy exchange between the venire member and Simms' counsel and the later accusation of brainwashing.

We also believe that an instruction to disregard the comments would have cured the prejudice, if any. First, it seems probable that the other venire members would have noted the statements by this venire member that she was subject to anxiety attacks, had forgotten to take her medicine, and was experiencing stress. It is likely that the other venire members would have considered her other comments in this context. In addition, the trial court almost immediately excused the venire member for cause, without a motion from Simms. Her departure at that stage of the trial would have emphasized the gravity of the instruction to disregard, making it easier for the remaining venire members to follow the instruction, thus mitigating the prejudice, if any, caused by her comments. *See Young*, 137 S.W.3d at 71.

Because a timely objection would have prevented much of the objectionable comments, and an instruction to disregard the venire member's comments would have cured any resulting prejudice, the trial court did not err in denying Simms' motion for mistrial. *See id*. at 72.

*(3)     The Trial Court Did Not Err in Failing to Sua Sponte Include a Benefit-Of-The-Doubt Instruction in its Jury Charge*

Simms also claims that the trial court erred in not including a benefit-of-the-doubt instruction in its jury charge. He argues that, since the jury was charged on the lesser-included offense of murder, the trial court should have sua sponte[9] given the following instruction:

> [I]f you find from evidence beyond a reasonable doubt that the defendant is guilty of capital murder on the one hand or murder on the other hand, but have a

_____

[9]At trial, Simms did not request a benefit-of-the-doubt instruction.

16

reasonable doubt as to which offense he is guilty, then you must find the defendant guilty of the lesser offense.

Simms points to the following paragraphs in the jury charge that follow the application paragraphs on capital murder:

If you so find then you shall find the defendant guilty of Capital Murder as charged in the indictment and disregard the lesser included offenses discussed in paragraphs IX, X, and XI.[10]

But if you do not so find, or if you have a reasonable doubt thereof, you will find the defendant, DA RYAN TARRELL SIMMS, not guilty of Capital Murder and next consider whether the defendant is guilty of the lesser-included offense of Murder.[11]

Simms argues that without a benefit-of-the-doubt instruction, the jury might have no reasonable doubt as to his guilt, but be confused as to the degree of the offense and be pointed to the greater offense.

"Where jury charge error is alleged, we first determine whether error exists in the charge; if there was error, we then determine whether sufficient harm resulted from that error to compel reversal." *Kihega v. State*, 392 S.W.3d 828, 835 (Tex. App.—Texarkana 2013, no pet.) (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). When, as in this case, "the defendant fails to properly object, reversal is warranted only where the appellant suffered harm so

---

[10]Paragraphs IX, X, and XI contained the application paragraphs on the lesser-included offenses of murder, aggravated robbery, and robbery, respectively.

[11]Following the application paragraph on murder, a similar paragraph instructed the jury that, if it did not find Simms guilty of murder, or if it had a reasonable doubt thereof, to find him not guilty of murder and consider the lesser-included offense of aggravated robbery. Likewise, following the application paragraph on aggravated robbery a similar paragraph instructed the jury that, if it did not find Simms guilty of aggravated robbery or if it had a reasonable doubt thereof, to find him not guilty of aggravated robbery and consider the lesser-included offense of robbery.

egregious as to have been denied a fair and impartial trial." *Id*. (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).

We find that there was no trial court error in failing to sua sponte include a benefit-of-the-doubt instruction in its jury charge. First, as Simms acknowledges in his brief, the general rule is that, when a charge includes greater and lesser degrees of an offense, it would be error to refuse to give a benefit-of-the-doubt instruction *when requested*. *Id*. (citing *McCall v. State*, 14 Tex. Ct. App. 353, 363 (1883) (cited with approval by *Barrios v. State*, 283 S.W.3d 348, 352 (Tex. Crim. App. 2009)); *Benavides v. State*, 763 S.W.2d 587, 589 (Tex. App.—Corpus Christi 1988, pet. ref'd). At trial, Simms did not request the instruction to be included in the charge. Simms has not cited any Texas authority, and we have found none, that requires the trial court to give this charge sua sponte.

In addition, when the jury charge includes an instruction after the greater offenses, as in this case, that instructs the jury that if it has reasonable doubt that the defendant is guilty of the greater offense, to find him not guilty of that offense and to consider whether he is guilty of the lesser-included offense, it is not necessary to give a benefit-of-the-doubt instruction. *Benavides*, 763 S.W.2d at 589. In such a case, the trial court does not err in refusing to give a benefit-of-the-doubt instruction, even if requested. *Benavides*, 763 S.W.2d at 589; *see Williams v. State*, No. 03-18-00267-CR, 2018 WL 3451635, at *9 (Tex. App.—Austin July 18, 2018, pet. ref'd) (mem. op., not designated for publication).

Consequently, the trial court did not err in failing to sua sponte include a benefit-of-the-doubt instruction in its jury charge. We overrule this issue.

*(4)      Simms' Sentence of Life Without Parole Does Not Violate the Eighth Amendment*

Simms also asserts that his automatic life-without-parole sentence violates the Eighth Amendment to the United States Constitution,[12] because Article 37.071, Section 1, of the Texas Code of Criminal Procedure[13] and Section 12.31 of the Texas Penal Code[14] violate the Eighth Amendment on their face[15] and as applied.  We disagree.

The facial constitutionality of a criminal statute is reviewed de novo.  *Salinas v. State*, 464 S.W.3d 363, 366 (Tex. Crim. App. 2015).  The statute is presumptively valid, and we presume that the Legislature did not act arbitrarily or unreasonably in enacting it.  *Cormier v. State*, 540 S.W.3d 185, 192 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002)).  To prevail, the challenging party must show that there is no set of circumstances under which the statute would be constitutional. *Id*. (citing *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013)).

---

[12]*See* U.S. CONST. amend. VIII.

[13]*See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1 (Supp.) (requiring the imposition of a life sentence, or a life sentence without parole in a capital felony conviction, as provided in Section 12.31 of the Texas Penal Code).

[14]*See* TEX. PENAL CODE ANN. § 12.31(a)(2) (requiring the imposition of a life sentence without parole in a capital felony conviction when the defendant was eighteen years of age or older when the offense was committed).

[15]Initially, the State contends that Simms did not preserve his complaint that Article 37.071, Section 1, and Section 12.31(a)(2) are facially unconstitutional.  To preserve a facial challenge to the unconstitutionality of a statute, the complaint must first be presented to the trial court.  *Karanev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). Simms challenged the constitutionality of his mandatory life sentence without parole in his motion for new trial filed in the trial court.  Although he did not specifically state that he was challenging Article 37.071, Section 1, and Section 12.31(a)(2) in his motion, his motion did challenge the sentencing scheme that provided for the automatic life-without-parole sentence.  Further, at the hearing on his motion for new trial, Simms informed the trial court that he contended that both the Texas Penal Code provision and the Texas Code of Criminal Procedure provision were unconstitutional, both facially and as applied to him.  Therefore, we find that Simms has preserved his facial and as-applied challenges to these statutes.

19

In his facial challenge to these statutes, Simms likens his automatic life-without-parole sentence to a death sentence and argues that the statutes are violative of the Eighth Amendment because they prevent him from offering mitigating evidence regarding his character, criminal record, and the circumstances of the offense, citing, inter alia, *Sumner v. Shuman*, 483 U.S. 66, 75–76 (1987), and *Roberts v. Louisiana*, 431 U.S. 633, 637 (1977).

In *Sumner*, the United States Supreme Court considered a Nevada statute that required an automatic death penalty for a defendant that was convicted of murder in prison while serving a previous sentence of life without parole. *Sumner*, 483 U.S. at 78. Since the statute did not allow for individualized-sentencing procedures that would allow the court to consider the defendant's character and criminal record, the circumstances of the offense, and the circumstances of the defendant, the Court held that the statute violated the Eighth Amendment.[16] *Id*. at 80–82, 85.

Simms asks us to apply the individualized sentencing procedures required in death penalty cases to automatic life without parole cases and to find that the challenged statutes violate the Eighth Amendment. However, the United States Supreme Court has previously rejected this argument. *Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991). In *Harmelin*, the Court upheld the constitutionality of a Michigan statute that required a mandatory life-without-parole sentence for defendants found guilty of possessing 650 grams or more of certain substances. *Id*. at 961 n.1. In holding that the individualized-sentencing requirement of *Sumner* is limited to death penalty

---

[16]Similarly, in *Roberts*, the Court held that a Louisiana statute that provided for a mandatory death sentence for the first-degree murder of a police officer, and which did not allow consideration of particularized mitigating factors, violated the Eighth Amendment. *Roberts*, 431 U.S. at 637–38.

20

cases, the Court reasoned "that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Id*. at 995.

Recently, our sister court of appeals followed *Harmelin* and rejected a facial challenge to Article 37.071 of the Texas Code of Criminal Procedure and Section 12.31 of the Texas Penal Code, holding that "the Eighth Amendment does not guarantee that adult defendants . . . must receive an individualized punishment hearing when given an automatic punishment of life without the possibility of parole for capital murder." *Cormier*, 540 S.W.3d at 193. Also relying on *Harmelin*, the Austin Court of Appeals rejected substantially the same argument as advanced by Simms and held that the prior versions of Article 37.071 and Section 12.31 did not violate the Eighth Amendment. *Watt v. State*, No. 03-97-00213-CR, 1999 WL 61207, at *4 (Tex. App.—Austin Feb. 11, 1999, pet. ref'd) (not designated for publication).

We agree with the reasoning of our sister courts of appeal and hold that Article 37.071, Section 1, of the Texas Code of Criminal Procedure and Section 12.31(a)(2) of the Texas Penal Code do not violate the Eighth Amendment.

Simms also challenges the constitutionality of these statutes as applied to his case. When applied to one set of facts, a statute may be valid, but be invalid when applied to another set of facts. *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). To prevail, Simms must show that the challenged statutes were unconstitutionally applied to him. *Id*.

Although Simms was twenty-one years old when the offense was committed, he argues that he shares many of the qualities of a juvenile and therefore that imposing a mandatory life-without-parole sentence was unconstitutional as to him. In support of his argument, Simms cites

21

*Miller v. Alabama*, 567 U.S. 460 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); and *Roper v. Simmons*, 543 U.S. 551 (2005).

In *Roper*, the United States Supreme Court invalidated the death penalty for offenses committed while the defendant was under the age of eighteen. *Roper*, 543 U.S. at 578. Five years later, the Court held that the Eighth Amendment prohibits the imposition of a life-without-parole sentence on a juvenile who did not commit homicide. *Graham*, 560 U.S. at 82. These two cases established "that children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. In them, the Court recognized significant differences between juveniles and adults:

> First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

*Id*. (citations omitted). Relying on the reasoning in *Roper* and *Graham*, the Court in *Miller* held that the Eighth Amendment forbids a sentencing scheme that mandates a life-without-parole sentence for juvenile offenders. *Id*. at 479.

Significantly, in *Miller* the Court noted the continued viability of *Harmelin* as to adults, limited its holding to juveniles, and specifically stated that *Miller* "neither overrules nor undermines nor conflicts with *Harmelin*." *Id*. at 481–82. Thus, for adults, a mandatory life-without-parole sentence is permissible under the Eighth Amendment. *Id*. at 481; *Harmelin*, 501 U.S. at 995–96.

22

As Simms acknowledges, an offender's age is relevant under the Eighth Amendment. The United States Supreme Court has determined that the dividing line between adulthood and childhood for penal purposes under the Eighth Amendment is the age of eighteen. *Graham*, 560 U.S. at 74–75; *Roper*, 543 U.S. at 574. It is undisputed that Simms was twenty-one on the date of this offense. Therefore, even if he does share some, or all, of the qualities generally associated with children, he remains an adult. *See Roper*, 543 U.S. at 574 (recognizing that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18"). Consequently, applying a mandatory life-without-parole sentence to him is permissible under the Eighth Amendment. *See Harmelin*, 501 U.S. at 995–96.

In support of his as-applied challenge, Simms also argues that, since the charge included instructions on liability as a party and conspiracy, it allowed the jury to find him guilty without finding that he had an intent to kill. Simms argues that more than thirty jurisdictions disallow the death penalty for non-triggermen who lacked the intent to kill and that the Eighth Amendment proscribes the death penalty for a person "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Enmund v. Florida*, 458 U.S. 782, 797 (1982). Simms cites no authority in support of his argument that this same principle should be applied to a mandatory life-without-parole sentence.

This argument is without merit. First, there is nothing in *Enmund* that supports extending its holding to a similarly situated defendant who receives a mandatory life-without-parole sentence. In addition, Simms is essentially arguing that he should have had an opportunity to put

23

on mitigating evidence that he was merely a party to the underlying felony, who had no intent to kill Stanford. However, this is simply another argument for individualized sentencing for life-without-parole sentences, which was rejected in *Harmelin*. Finally, there is evidence in the record from which a rational jury could find that Simms was liable as a principal, and not merely as a party.[17]

On this record, we find that Simms has not shown that Article 37.071, Section 1, of the Texas Code of Criminal Procedure and Section 12.31(a)(2) of the Texas Penal Code were unconstitutionally applied to him. *See Fine*, 330 S.W.3d at 910. We overrule this issue.

We affirm the judgment of the trial court.


Josh R Morriss III
Chief Justice


Date Submitted:     May 23, 2019
Date Decided:       June 14, 2019

Do Not Publish

---

[17]*See supra* notes 3–4.